UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

    *Plaintiff,*

v.                                                              Case No. 12-cr-189

NICOLE TALSKY,

    *Defendant.*

## SENTENCING MEMORANDUM

### Argument

Nicole Talsky's sentencing hearing is scheduled for Monday, January 6, 2014. At the sentencing hearing, Talsky will seek a time served disposition with the imposition of four years of supervised release. Talsky's role in the offense, background and rehabilitative needs, and potential for success support this request.

**1.0    The Guidelines**

At every sentencing, the district court is first obligated to calculate the correct advisory guideline range and then to decide whether to impose a sentence within the range or outside of it. *United States v. Miranda*, 505 F.3d 785, 791 (7th Cir. 2007). Talsky submitted two objections to the probation officer's determination of the guidelines: the calculation of the base offense level and the extent of the reduction for her role in the offense. The government does not object to Talsky's position on the former and agrees with the PSR on the latter.

    **1.1    Base Offense Level**

Talsky and the government are in agreement that the Base Offense Level is 26 based on her responsibility for the distribution of between 500 grams and two kilograms of cocaine. This is based on the facts agreed to in Attachment A to the Plea

Agreement. Dkt. 220:15-16. The government submitted a separate statement of the facts, which also contended that Talsky was responsible for between 500 grams and two kilograms of cocaine. Talsky did not travel to Texas on "other occasions," as the probation officer said in her response to the objections, rather, Talsky traveled there once. *See* Dkt. 286-1:1, Dkt. 220:15-16. The deals Talsky "middled" involved her acting as a cashier: accepting money from the customer, which she gave to Oliver or Steven Jones, in exchange for drugs, provided by Oliver and Steven Jones, which she gave to the customer. *Id.*

In agreeing to a Base Offense Level of 26, the parties—who had the benefit of the discovery—took Talsky's actions into consideration, including her one trip to Illinois, one trip to Texas, and her actions middling deals at the J Spot. Admissions in a plea agreement establish admitted facts and are "even better than a jury's finding beyond a reasonable doubt," *United States v. Warneke*, 310 F.3d 542, 550 (7th Cir. 2002), and this Court should accept the parties' agreement.

Although the government "acknowledges that Ms. Talsky accompanied Getharia Smith to Texas to obtain four kilograms of cocaine," neither Attachment A to the Plea Agreement nor the government's version of facts describes how much cocaine was purchased on that trip other than to describe it as "kilogram sized." Dkt. 220:16. But the amount doesn't really matter—as the government points out in its objection, Talsky's trip to Texas was unrelated to the amount of cocaine Smith was there to obtain. Talsky was not there to personally transport the cocaine.

If the probation officer believes, as she does, that Talsky is responsible for more than two kilograms of cocaine, she must provide support for that contention. Rather, she uses the same facts Talsky and the government rely upon to claim that Talsky is responsible for twice the drugs. The response to the objections does not explain why 3.5 to five kilograms is more appropriate than, for example, two to 3.5 kilograms. Because the response does not explain either the conclusion (3.5 to five kilograms) or why the probation officer skipped a level (two to 3.5 kilograms), there is no support for this Court to find, by preponderance of the evidence, that Talsky is responsible for more than 500 grams to two kilograms of cocaine, as stated in Attachment A to the Plea

2

Agreement. *See United States v. Medina*, 728 F.3d 701, 705 (7th Cir. 2012) (court's findings are by preponderance of the evidence). In making its drug quantity finding, this Court may base its sentence on information with "sufficient indicia or reliability to support its probably accuracy." *United States v. Longstreet*, 567 F.3d 911, 924 (7th Cir. 2009). The response to Talsky's objection does not meet this test. Accordingly, this Court should find, as Talsky and the government have agreed and explained, that Talsky's Base Offense Level is 26.

### 1.2 Adjustment for Role in the Offense

Section 3B1.2 permits a decrease in offense level if the person is a "minimal participant" or a "minor participant." For the former, the defendant receives a four-level decrease and for the latter, a two-level decrease. *See* §3B1.2. A defendant whose behavior falls in between the two may receive a three-level decrease. *Id.* This guideline applies to "a defendant who plays a part in committing the offense that makes him substantially less culpable than the average participant." §3B.12, App. Note 3(A). This is necessarily a "determination that is heavily dependent upon the facts of the particular case." §3B.12, App. Note 3(C). To determine the extent of the decrease, this Court must compare Talsky's role in the offense to the role of the average participant. *United States v. Diaz-Rios*, 706 F.3d 795, 799 (7th Cir. 2012). This Court may also look at the defendant's "role in the conspiracy as a whole, including the length of [her] involvement in it, [her] relationship with the other participants, [her] potential financial gain, and [her] knowledge of the conspiracy." *Id.* The PSR and the government, through the plea agreement, believe a two-level reduction is warranted under §3B1.2(b). While Talsky agrees that a reduction is warranted, she believes the proper decrease is four levels under §3B1.2(a).

Talsky was involved in the lowest amount of drugs attributed to a participant in this conspiracy (500 grams to two kilograms of cocaine). This amount was also attributed to Jessica Talsky (Dkt. 247) and Dean Rouse (Dkt. 238). The other participants were much more involved: Jose Duran (Dkt. 240), and Chaluda Smith (Dkt. 254) were involved in two to 3.5 kilograms of cocaine; Tiffany Martinez (Dkt. 249) was involved in

3

3.5 to five kilograms of cocaine; Oliver Jones (Dkt. 231) was involved in five to 15 kilograms of cocaine; and Getharia Smith (Dkt. 223) and Steven Jones (Dkt. 233) were involved with 15 to 50 kilograms of cocaine.

But even comparing Talsky to her sister and Rouse, Talsky is the least involved. Jessica Talsky stored powder cocaine, heroin and ecstasy in her home and helped convert powder cocaine to crack cocaine. *See* Dkt. 247:3. She helped obtain cocaine and pills, which she turned over to Steven Jones for sale. *Id.* For his part, Rouse purchased larger quantities of cocaine, which he then resold to others. *See* Dkt. 238:3.

Besides Talsky, only one other defendant will receive the government's recommendation for a reduction based on role in the offense—Tiffany Martinez. Simply put, if Tiffany Martinez's role in the offense warrants a two-level reduction, then Nicole Talsky's role warrants four levels.

Martinez was much more involved in the conspiracy than Talsky. Not only is Martinez responsible for more cocaine, but she also allowed Steven Jones to store kilogram-quantities of cocaine in her home and to convert powder cocaine to crack cocaine there. *See* Dkt. 249:16. Martinez traveled to Rockford twice and to Texas three times. *See* Dkt. 249:16-17. Martinez was directly involved in paying Jones' Texas supplier and transporting the drugs to Jones. She personally handled about $130,000 to directly paid the supplier. *Id*. She made all of her trips to Texas herself in a rental vehicle and personally delivered the cocaine to Jones upon her return to Milwaukee. *Id.*

A defendant plays a minimal role in the activity if she is among the least culpable of those involved in the group. *See* U.S.S.G §3B1.2; *United States v. Gutierrez*, 978 F.2d 1463, 1471 (7th Cir. 1992). As Talsky's Plea Agreement shows, Nicole Talsky's participation was mostly at the direction of Steven Jones: she went to Illinois and Texas once at his direction and she looked in cars to see if she recognized any law enforcement officers at his request. Dkt. 220:3-4. This differs substantially from Martinez's multiple trips. Unlike Martinez, Talsky only drove there and back and each time with other people; she was not involved in the actual purchase of drugs nor did she handle several thousands of dollars, like Martinez.

4

The probation officer dismisses this and rather than compare Talsky to the other members of *this* conspiracy, she seems not only to compare Talsky to other conspiracies but to conclude that Talsky's involvement at all defeats any possibility of minimal role reduction. Everyone in the conspiracy "assisted Steven Jones in the distribution of controlled substances at the J-Spot and other locations." Dkt. 286-1:3. That was the whole purpose of the conspiracy. So Talsky's role in doing that doesn't distinguish her from anyone; if she had not being involved in assisting Steven Jones in the distribution of controlled substances she wouldn't be a member of the conspiracy at all.

The probation officer's conclusion that "Talsky was not involved in merely one transaction or held or mailed a package on one occasion" also does not distinguish her from anyone else. *No one* in the conspiracy was involved in only one transaction and as far as counsel is aware, no one was involved in mailing any drugs. Nearly everyone involved in this conspiracy sold drugs out of the J Spot, so Talsky's participation in doing that does not distinguish her from anyone else.

As for Talsky's "counter-surveillance," it's not as if she was hiding in the bushes spying on law enforcement. When Jones told her to go outside and see if she recognized any police officers, she did. She didn't counsel him on how to avoid detection; rather, she did as she was told.

Even accepting the probation officer's conclusion that Talsky was involved in 3.5 to five kilograms of cocaine, the comparison between Martinez (who is definitely involved in 3.5 to five kilograms of cocaine) and Talsky proves that Talsky was much less involved in the conspiracy. Talsky's sale of drugs as a member of the conspiracy equivalent to that of a cashier: she received money and gave it to Oliver and Steven Jones. The Jones' gave her the drugs and Talsky handed them over to the paying customer. *See* Dkt. 220:4. Her purchase of cocaine was for her own personal use. She didn't store drugs in her home, purchase large amounts for resale or convert powder cocaine to crack cocaine. She didn't take any independent actions within the conspiracy, other than to feed her own habit. Talsky was also the first to enter a plea and will be the first to be sentenced.

5

Case 2:12-cr-00189-RTR   Filed 01/03/14   Page 5 of 15   Document 291

For these reasons, Talsky's conduct makes her a "minimal participant" not just a "minor participant," which warrants a four-level reduction. At the very least, Talsky qualifies for a three-level reduction for conduct that falls in between "minimal" and "minor."

### 1.3 Adjusted Offense Level and Guideline Range

Based on the above explanations of the Guidelines, Talsky believes they are correctly calculated as:

| | |
|---|---:|
| Base Offense Level — §2D.1.1(c)(7) | 26 |
| Specific Offense Characteristics 5C1.2(a)(1)-(5) (safety valve) | -2 |
| Adjustment for Role in the Offense — §3B1.2(a) | -4 |
| Acceptance of Responsibility — §3E1.1(a) | -2 |
| Acceptance of Responsibility — §3E1.1(b) | -1 |
| Total Offense Level | 17 |
| Criminal History | Category I |
| **Guideline Range** | **24 to 30 months** |

Talsky respectfully asks this Court to adopt her guidelines' calculation as laid out in the table above.

### 2.0 Background and Rehabilitative Needs

Like too many who have come before this Court, Nicole Talsky has had a hard life. It's impossible for the PSR, this memoranda, or anything the defense could say at sentencing to capture the difficulties she endured growing up. When Nicole was her most vulnerable, the people who were supposed to care and provide for her did not.

Nicole was the second oldest child born to drug addicts. Her older sister, Jessica, is a co-defendant in this case. Because of their age, Jessica and Nicole suffered the most at the hands of their careless parents. The first time Nicole entered the foster care system she was 8 years old. Concerned family members had stopped by to visit her

6

Case 2:12-cr-00189-RTR   Filed 01/03/14   Page 6 of 15   Document 291

parents and, at the time, their five children: Jessica, Nicole, Zachary, Alexandria, and Courtney. They found a house in unlivable conditions and called police. Nicole's father, Richard Talsky, ran away because he had several outstanding warrants. There was no food in the house and police saw evidence of drug use. Nicole's mother, Wendy, told police she was suicidal and the police took her to the Milwaukee County Mental Health Complex. The Bureau of Child Welfare found relative placements for all five of the children and a CHIPS (children in need of protective services) case was opened.

The five Talsky siblings remained in foster care for about 18 months before Wendy got clean, established a safe home, and could have the children returned to her. In that 18 months, Wendy and Richard had two more children, Richard Jr. and Jason. Nicole had been doing well in this first placement—she liked school and got involved in ballet classes. She had difficulty adjusting to her return home.

Over the next three years, when Nicole was age 10 to a month before her 13th birthday, the Bureau responded to six complaints about Wendy and Richard's home. The complaints all had several things in common: reports of filthy home, no food in the house, and drug use. And "filthy" doesn't real do the complaints justice—it is not as if the home was cluttered and hadn't been vacuumed in a few weeks. Rather, there were reports of dirty diapers and garbage on the floor, rats and cockroaches, a clogged and over-flowing toilet, and a crib soiled with feces. The allegations of drug use involved reports of high traffic in and out of the house, Richard using marijuana and crack in front of his children, and allegations that Richard would sell the food he got with food stamps, presumably to buy drugs.

All of the complaints were unsubstantiated. In Nicole's PSR interview, she revealed some explanation as to why: Wendy would stock the fridge and clean the house before she would let Child Welfare in the door. Many times in investigating the complaints, workers would be forced to leave cards when no one answered the door and would return later.

It is an imperfect system that sometimes defies common sense. For example, on November 23, 2004, the Milwaukee Police Department entered the Talsky residence after chasing Richard into the home on outstanding paternity warrants. The officers

7

called the sensitive crimes division because of the condition of the home. When officers from sensitive crimes arrived, they saw clothes everywhere, a bathroom with a clogged tub, and drywall coming off the walls. The children were dirty and food was limited. Still, the Bureau found the complaint unsubstantiated.

It was during these years, that Wendy and Richard had three more children: Sean, Brianna and Hailey. Wendy suffered a brain injury during Hailey's July 2004 birth. As a result, Hailey went immediately to live with her grandmother. It was also during this time that what care was provided to the children fell on the shoulders of Jessica and Nicole: they fed the kids what little food was in the house, they helped them get ready for school, they comforted them when they were upset and disciplined them when they misbehaved. At the age of 10, Nicole found her self co-parenting six small children. She and Jessica did everything they could to love and care for them.

It wasn't until February 2, 2005, nearly three years after the first complaint the Bureau investigated after the children were returned home that a complaint was substantiated. But this one could hardly be ignored. Jason Talsky arrived at school with a burn on his upper arm and the school called the Bureau. Still, they were not immediately removed from the home. A week later, a social worker arrived at the Talsky residence for a safety services meeting. (Safety services had been put in pace a month earlier to help out). Jason's burn was never treated, Alexandria had blood in her stool and there were two unknown men taking care of the children who the worker suspected were drug dealers.

The safety services worker determined that the Talsky family's needs surpassed their abilities. Fourteen-year-old Jessica had a boyfriend who had been sleeping over. The home was in total disarray. Jason, Brianna, Alexandria, Courtney and Sean were dirty. Brianna was sleeping in a crib soiled with feces. The toilet was clogged and overflowing. The children's bedrooms were cluttered with clothes, toys and other debris. There were cat feces on the floor and three of the girls had untreated head lice. The bureau took the children, but not Nicole. When Nicole saw the bureau workers, she knew exactly what was going to happen. She went to a friend's house instead of staying to watch her siblings being separated.

8

Jessica and Nicole appeared for the first hearing scheduled in the CHIPS case a few days later. The judge ruled that the two could be on an extended visit with their mother until a neighbor could be evaluated to take them. Instead of staying with her mother, Nicole stayed with a friend. The neighbor later backed out. A few weeks later, Nicole turned 13 years old. A month later, Jessica and Nicole were finally placed.

Over the next five years, Nicole bounced from foster home to foster home, and later from group home to group home. She struggled to keep in touch with her siblings, attending regular sibling meetings. She and Jessica seemed desperate to see their family reunited and worried that the adoption of the younger siblings would cause the permanent break up of their family. She hated the rules imposed—she wasn't used to any type of supervision or rules. Even though life with her parents hadn't been good, Nicole would go see them whenever she could—it's what she knew and she just wanted her family back.

The difficulties of living in strangers' homes without most of her siblings caused extraordinary stress to Nicole. She became angry all of the time, she struggled to get along with others, and to pay attention or even care about school. She saw several therapists over the years, but never anyone for a particularly long period of time and never anyone she trusted. Nicole did know how to talk to her therapists about what happened to her family and how she was feeling; it's not something she had ever done before. In her mind (at the time, the mind of a child), she thought it was better to just ignore what was happening. Her diagnoses were all over the place: ADD, hyperactivity, ADHD, bipolar, depression. The treatments were equally different, sometimes involving "talk therapy" and other times involving medication, but Nicole was never on medication for long.

To cope, she began using drugs. She simply couldn't take the pain of her daily life; she just wanted to forget. So she did what she had spent her formative years watching her parents do: drugs. Her experimentation began at an astonishingly early age. She drank alcohol for the first time at age 8. She drank regularly from age 11 to about 14, but it wasn't her drug of choice and she quit. She smoked marijuana for the

first time when she was 11 and continually increased the frequency until she was smoking daily by the time she was 13. That continued until she was arrested.

She graduated to cocaine when she was 13. She had easy access: her father sold it to her. By the time she was 16 years old, she was using cocaine on a daily basis. She stopped using all drugs when she went to Lydia Group Home in Union Grove. Here, she seemed to excel—her attendance at school was good, her grades went up, she started actively participating in individual and group therapy and, perhaps most importantly, she stayed there and didn't run away.

A doctor who evaluated Nicole while she was at Lydia reported that her main problem was a lack of attachment to anyone. The doctor opined that if Nicole felt a sense of belonging and attachment, she would comply because she yearned for a primary relationship. She craved a human connection in which she was valued. While at Lydia, she got a job and made strides in dealing with the anger issues that plagued her from the time she entered foster care.

The doctor was right—Nicole was motivated to work hard and try because a couple, who were family friends, were interested in fostering her, but only if she promised not to run away and meet her obligations. The couple kept in touch with Nicole and began going through the process to be licensed. Nicole was excited at the possibility of finally having the family and home she so desperately wanted. But as time went on, the couple started visiting less, and Nicole's calls to them went unanswered. She completed the program, but never went to live with them because the couple had checked out. Nicole's success began to slip away and she returned to her old ways, running away, skipping school, and seeking comfort in the numbing effects of drugs.

Her involvement in this case was a direct result of her need for drugs. She and her sister Jessica remained close, and Jessica's boyfriend and father of her child is Steven Jones. Nicole met Jones with her sister at a car shop where Jessica's car was being worked on. Jones started dating Jessica and was around Nicole more and more. At first, Nicole would buy drugs from him for herself. Then, he opened the J Spot and offered Nicole a job. Nicole was a cashier who worked part time, and she would continue to buy cocaine from Jones for her own use.

10

Nicole's involvement in the conspiracy started slowly. About five months after she started working, Jones starting giving Talsky money to give to certain people who would stop in. Next, Jones had Nicole collecting money while she worked. Finally, Nicole graduated to middling deals—she would collect money in exchange for drugs. As Attachment A to the Plea Agreement describes, Nicole also made one trip to Illinois and one to Texas to help facilitate the purchase of drugs. Almost all of the money Nicole got paid working at the J Spot went to feed her own habit. She certainly wasn't in it for the financial gain; there was none. She was in it for the drugs.

Nicole's drug use prevented her from keeping a job for long or graduating high school. As she explained to the probation officer, it was just too hard to juggle school. She got further and further behind and just quit. She was three credits shy of graduating.

Nicole successfully completed a 30-day in-patient program at Genesis, but upon her completion again struggled with her sobriety. She was involved with a man who was not a good person and who Judge Joseph ordered her to stay away from, but who Nicole felt cared about her and who provided for her. With him, she didn't feel so alone. Nicole's craving for family, for a human relationship, makes her vulnerable to those who would take advantage. Her violations on bond landed her in the Dodge County Jail in February 2012.

This is Nicole's first ever incarceration and her time at the jail has not been easy. She has struggled with her health, which went untreated until she filed a motion and the government forced the Marshal's service to treat her. She worked extremely hard on her education, obtaining not only her GED, but also her HSED.

At the Dodge County Jail, there is no GED class for women. As the instructor, Ellen Helgren explained, there are so few women that need the class that they don't have one. But once Helgren met Nicole, she realized that Nicole was very capable. Helgren offered to work with Nicole to help her study on her own time, volunteering her services. She taught her one-on-one, meeting with Nicole for an hour and always meeting late at night after her last class left, at around 9 p.m.

11

Helgren said that she really enjoyed working with Nicole. Nicole is a good reader and works hard on the math and science. Nicole wants to get perfect scores, Helgren said, and gets frustrated by anything less. Helgren said Nicole listens well: when Helgren explains how to approach a problem, Nicole gets it and Helgren doesn't have to explain it to her over and over.

At one of the bond hearings, Judge Joseph said to Nicole that she has to stay away from the people that are not good for her and that's hardest to do when those people are family. Nicole has thought a lot about that over the last 11 months, as she makes plans for her future. She has matured in jail. As was true of her childhood, her parents have shown little interest in her over the past several months she's been in jail. Nicole plans to keep it that way.

Upon her release, she wishes to move in with Angela Silva, a former neighbor and friend. Probation previously approved Silva's residence for Nicole. She wishes to find a job, get her own apartment, and eventually enroll part time in MATC classes. Her original dreams of being a dentist or orthodontist are over as a result of this conviction. She's begun to turn her attention to whatever job she can get in a dental office, perhaps a dental hygienist. Her incarceration has kept her sober for 11 months, the longest period of sobriety ever. Nicole wants to keep it that way. She plans to work with her probation officer so that she may be involved in outpatient treatment, whether that be through regular NA meetings or something more formal. Drugs have ruined her life, but when she was child and a victim of her parent's drug use, but certainly has an adult and her involvement in this case.

Nicole readily admitted her role in the offense. She was the first to enter a plea and she is the first to be sentenced. She is desperate to prove to everyone involved in her case that she can be a successful person, who works hard and stays sober. She wants a quiet life. Her dream is a small house that she earned and one day a family of her own. She wants to stop the cycle of drug use that has permeated her family.

**3.0     Bases for Leniency**

A time served disposition with four years of supervised release meets the goals of sentencing. It's hard to imagine a child growing up under the circumstances outlined in the PSR. Yet, that was Talsky's reality. It's a small miracle that Talsky has neither a criminal history nor children of her own. This 11-month period in jail and the steps she has taken while there lend credence to a legitimate belief that Talsky will leave behind criminal conduct and her reliance on drugs for relief.

The second reason for imposing a below-guideline sentence relates to the marriage of the guideline range to drug weights. Commentators have long criticized the guidelines' heavy reliance on drug weight rather than on the defendant's role in the offense. *See, e.g.,* JEFFREY L. FISHER, *When Discretion Leans To Distortion: Recognizing Pre-Arrest Sentence-Manipulation Claims Under the Federal Sentencing Guidelines*, 94 MICH. L. REV. 2385, 2401, fn. 78 (1996), *citing* DOUGLAS A. BERMAN, *The Second Circuit: Attributing Drug Quantities to Narcotics Offenders*, 6 FED. SENT'G REP. 247, 251 (1994) (questioning the wisdom of quantity-based sentences); JON O. NEWMAN, *Five Guideline Improvements*, 5 FED. SENT'G REP. 190, 190 (1993) (advocating abandonment of the "excessive reliance on the drug quantity table" in favor of a system that will "correlate drug sentences primarily with the defendant's role in the drug distribution system"); DEBORAH YOUNG, *Rethinking the Commission's Drug Guidelines: Courier Cases Where Quantity Overstates Culpability*, 3 FED. SENT'G REP. 63, 64 (1990) (pointing out the necessity of more fully considering the offender's role in the criminal enterprise, and arguing that the role-in-offense provision does little to remedy this injustice.)

Whether Talsky was responsible for no more than two kilograms or cocaine or 3.5 to five kilograms, her involvement was still limited, as compared to her co-conspirators, and was motivated exclusively by her own drug habit. She wasn't developing her own customers, investing her own money to purchase large quantities or making any money. The weight of the drugs shouldn't drive the amount of time she spends in prison given her role in this offense. Imposing a guidelines sentence would

13

result in a sentence that is greater than necessary to satisfy the purposes of sentencing. *See Gall v. United States*, 128 S.Ct. 586, 601-02 (2007).

Leniency is also warranted because this has been Talsky's first incarceration, which has had a greater impact on her than someone who had previously been imprisoned. *See United States v. Qualls*, 373 F. Supp. 873 (E.D. Wis. 2005) and *United States v. Baker*, 445 F.3d 987 (7th Cir. 2006). Spending 11 months in jail has a way of making a person seriously reflect on their past decisions and their future. Nicole has done that — it's virtually all she will talk about.

As a result of her imprisonment, Nicole has little to offer in the way of proof that she will success in a drug-free and crime-free life. But if ever anyone was deserving of a chance to prove to everyone that she could make it—it's Nicole Talsky. The imposition of four years of supervised release is also nothing to sneeze at. If Nicole returns to her old life, she will immediately be revoked and returned to prison and there will be no third chance. The defense's recommended sentence will not derail Talsky from the positive steps she made under difficult circumstances at the Dodge County Jail and it will give her the final incentive she needs to make permanent changes in her behavior.

## Conclusion

The defense believes that a sentence of time served and four years of supervised release is sufficient but not greater than necessary to effect all of the goals of sentencing. It is a sentence that will deter Talsky from her prior behavior and promotes respect for the law, while at the same time giving Talsky a chance to continue making positive strides in her life outside of a confined setting.

Talsky respectfully asks this Court to impose the sentence she recommends.

Dated at Milwaukee, Wisconsin, January 3, 2014.

>Respectfully submitted,
>
>BIZZARO LAW LLC
>Counsel for Nicole Talsky, *Defendant*.
>
>/s/ Amelia L. Bizzaro
>_____
>Amelia L. Bizzaro
>State Bar No. 1045709
>2266 N. Prospect Ave, Suite 310
>Milwaukee, Wisconsin 53202
>[414] 224-5326 [phone]
>[414] 255-3484 [facsimile]
>abizzaro@bizzarolaw.com